NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| IRA BERNSTEIN, M.D., et al., | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 05-4702 (HAA) |
| –v.– | ) ) | **OPINION & ORDER** |
| STUART O. GOLDSMITH, et al., | ) ) | |
| Defendants. | ) ) | |

Peter J. Frazza, Esq.
BUDD LARNER, P.C.
150 John F. Kennedy Parkway
Short Hills, New Jersey 07078
*Attorneys for Plaintiffs*

Eduardo J. Glas, Esq.
MCCARTER & ENGLISH, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
*Attorneys for Defendants*

**ACKERMAN, Senior District Judge:**

On May 23, 2006, this Court held a hearing in the above-captioned matter to consider Defendants' motion for a preliminary injunction against any further efforts by Plaintiffs to unseat Defendant Stuart O. Goldsmith as general partner of Riverside Medical Arts Associates, pending the ultimate outcome of this matter. For the following reasons, Defendants' motion is GRANTED.

1

I.      **Factual and Procedural Background**

This is a dispute between the limited partners ("Plaintiffs") and Defendants concerning the management of a New Jersey limited partnership known as Riverside Medical Arts Associates (the "Partnership"). Defendant Stuart Goldsmith is the general partner, and his son, Defendant James Goldsmith, holds power of attorney for his father and exercises control over the day-to-day management of the partnership.[1] In addition, James Goldsmith is the principal of Defendant Gator Investments, Inc. ("Gator"). There is some dispute as to whether Gator is an incorporated entity, or indeed whether its true name is Gator Development Corp. However, there is no dispute that Gator serves as management agent for the Partnership's sole asset, a medical arts building located in River Edge, Bergen County, New Jersey (hereinafter referred to as "Riverside"). Gator's principal place of business is in North Miami Beach, Florida, where the Partnership's books are maintained.

Plaintiffs are limited partners in the Partnership who are comprised entirely of physicians practicing at Riverside. Although this action began as a suit to enforce the limited partners' right to inspect Partnership records, Defendants counterclaimed that Plaintiffs breached their fiduciary duties by attempting to remove Stuart Goldsmith as general manager. On January 5, 2006, shortly before Defendants sought this preliminary injunction, Plaintiffs met and purported to appoint a new general partner: Riverside Medical Management LLC ("RMM"). Plaintiffs generally argue that Stuart Goldsmith has abdicated his interest in the Partnership, that he is squandering Partnership assets, and that Riverside is falling into disrepair.

---

[1] Stuart Goldsmith is a New York resident and James Goldsmith is a Florida resident; all of the Plaintiffs are New Jersey residents. Defendants concede that Plaintiffs' allegations, if proven, would result in damages in excess of $75,000. Therefore, diversity jurisdiction is proper.

The general and limited partners had a previous dispute that was settled in 1988 pursuant to a settlement agreement (the "Settlement Agreement"). Under the Settlement Agreement, Stuart Goldsmith was to remain as general partner in perpetuity. However, he was voluntarily to relinquish 18% of his ownership per year so as to reduce his ownership stake to 46% by December 31, 1990. Once this happened, he would cease being primary general partner and become secondary general partner.[2] The limited partners agreed to take no action to divest Stuart Goldsmith of his remaining general partnership interest (Settlement Agreement 5, ¶ 3), and Defendants construe this to mean that Stuart Goldsmith may never be removed as a general partner during the life of the Partnership (*see* 2/6/06 Tr. 17:6-15; 22:16-23:4).

Defendants contend that Plaintiffs' purported election of RMM on January 5, 2006, as well as subsequent acts by RMM to exercise control over the Partnership, violated the Settlement Agreement's prohibition against efforts to unseat Stuart Goldsmith. On January 23, 2006, RMM's manager, Dr. Andrew Osiason, advised Gator that its services had been terminated. Dr. Osiason also began dealing directly with vendors who service Riverside. Finally, on January 27, 2006, Dr. Osiason advised Brite Star Building Management, Riverside's local on-site property manager, that its services were no longer needed.

Plaintiffs defend their actions by asserting that Stuart Goldsmith retired from his position as general partner in 2000—an assertion that Defendants vigorously dispute. If he retired, then pursuant to the terms of the Certificate of Limited Partnership, he is no longer the general

---

[2] Stuart Goldsmith became secondary general partner on November 1, 2005. Plaintiffs contend that the Settlement Agreement allowed for Stuart Goldsmith to be reduced to secondary general partner any time *after* his ownership interest was reduced to 46%. (*See* 2/6/06 Tr. 25:8-26:2.)

partner.[3]  There is also some question as to Stuart Goldsmith's health in the wake of a debilitating skiing accident in 1998.  The record contains some evidence that Stuart Goldsmith gave power of attorney to his son, James Goldsmith, to execute the functions of general partner.  However, Plaintiffs contend that the Settlement Agreement required 50% of limited partners to approve such a move, and this action was never put to a vote.  Plaintiffs thus insist that Stuart Goldsmith divested himself of his Partnership interest.

Plaintiffs contend that they have been paying monthly rent, yet Riverside is falling into disrepair.  They brought this action (originally in Bergen County and subsequently removed to this Court) to seek access to Partnership documents so Plaintiffs can determine how Defendants are spending Partnership monies.  Paragraph 16 of the Partnership Agreement requires the Partnership to maintain full and accurate records, and to report the Partnership's statements to all of the partners within 60 days after the close of each calendar year.  Plaintiffs succeeded in obtaining access to some records from Gator's office in Florida, and they contend that a review of those records reveals evidence of impropriety.

In February, Defendants sought an order to show cause and temporary restraints.  At that time, there were two competing factions trying to manage the Partnership, and vendors did not know with whom to deal.  Defendants argued that this power struggle was creating irreparable damage and sought to have the status quo maintained pending resolution of the underlying

---

[3] Paragraph XIII of the Certificate of Limited Partnership provides that
> [i]n the event of death, bankruptcy, retirement, insanity, or incompetency of an General Partners, any one or more of the remaining General Partners if any, shall have the right to continue the business of the Partnership or the Limited Partners, by 50% weighted vote, may designate a new General Partner.

(Certificate of General Partnership ¶ XIII.)

dispute.  On February 6, due to the temporary unavailability of this Court, District Judge Dennis M. Cavanaugh held a hearing at which the parties advanced two competing views on whether the Settlement Agreement permitted the limited partners to change Stuart Goldsmith into a secondary general partner after 1990.  Unable to determine whether there was a likelihood of success on the merits, Judge Cavanaugh permitted the parties two weeks in which to depose Stuart Goldsmith and James Goldsmith.  Judge Cavanaugh also imposed temporary restraints for that two-week period on Plaintiffs' ongoing efforts to unseat Stuart Goldsmith.  Finally, Judge Cavanaugh directed that Defendants post a bond in the amount of $5,000.

On February 23, 2006, Judge Cavanaugh held a follow-up hearing to consider the application for a preliminary injunction in light of Stuart Goldsmith's and James Goldsmith's deposition testimony.  Stuart Goldsmith testified at deposition that due to his advanced age and disabilities, he had turned over the day-to-day operations of the Partnership to his son, James.  Stuart Goldsmith also testified that he remained in steady communication with his son.  However, he further testified that he did not review budgets and had imperfect knowledge of his son's activities in the management of the Partnership.  There is evidence that the Partnership began to incur municipal violations, and that Stuart Goldsmith was not signing key documents.  Plaintiffs characterize Stuart Goldsmith's testimony as conceding an abdication of general management responsibilities.

At the February 23rd hearing, Mr. Peter Frazza, counsel for Plaintiffs, requested another continuance.  He claimed that Defendants withheld certain key documents on a claim of attorney-client privilege but failed to provide a privilege log.  The documents were in the custody of Cole, Schotz, Meisel, Forman & Leonard, P.A. ("Cole Schotz"), the Partnership's attorneys.  Judge

5

Cavanaugh ordered Mr. Frazza to express his demand for the documents in a letter, and ordered that Defendants respond to Mr. Frazza's letter. At that time, Judge Cavanaugh would hold a conference call in which he would set a new return date for the motion for a preliminary injunction.

By letter dated March 28, 2006, Mr. Eduardo Glas, counsel for Defendants, advised the Court that the parties had completed the limited discovery for which Judge Cavanaugh had granted a continuance. Accordingly, the parties requested the rescheduling of the preliminary injunction hearing. Judge Cavanaugh gave the parties leave to submit supplemental briefs in support for and in opposition to Defendants' motion for a preliminary injunction. Plaintiffs filed their brief in further opposition to Defendants' motion on April 19, 2006, and Defendants filed their brief in further support for their motion on April 24, 2006. The case was transferred back to this Court around this time.

Plaintiffs claim that they have learned that Stuart Goldsmith is using Partnership funds to pay legal fees for at least five other projects that he is involved in, and that he has abdicated his role as general partner to his son James. Indeed, Plaintiffs go so far as to accuse Stuart Goldsmith of committing perjury by representing to the Court that a certain $12,000 payment to Cole Schotz was for work relating to the refinancing of Riverside's mortgage, when in fact subsequent discovery revealed that the check was payment for legal work relating to other properties owned by Stuart Goldsmith. Given these circumstances, Plaintiffs urge, the Court should not permit the status quo to be maintained by allowing Stuart Goldsmith to remain as general partner. They also suggest that "until this case is tried, the TRO needs to be dissolved and a special fiscal agent or other court-appointed individual needs to be appointed to run the

affairs of the partnership." (Pls.' Supplemental Br. 1.)

Defendants broadly deny Plaintiffs' allegations and assert that Plaintiffs are merely trying to steal Stuart Goldsmith's interest and position. With respect to alleged accounting irregularities, Defendants contend that Plaintiffs are either mistaken or are twisting the facts to achieve their desired ends. Defendants also assert that Plaintiffs have inappropriately resorted to the remedy of self-help. Finally, Defendants note that Plaintiffs have not demonstrated the necessary gross or fraudulent mismanagement or gross abuse of trust necessary for the appointment of a fiscal agent. Accordingly, Defendants seek a preliminary injunction against any further efforts to unseat Stuart Goldsmith pending resolution of the underlying dispute.

After the supplemental briefs were filed, counsel for Plaintiffs requested permission to file a 3-page letter-reply, addressing what they contended were factual inaccuracies in Defendants' supplemental brief. The Court granted Plaintiffs' request, subject to Defendants having an opportunity to respond. Plaintiffs submitted their letter-reply on May 17, 2006; Defendants advised the Court that they will not be filing a sur-reply.

On May 23, 2006, this Court held a hearing on Defendants' motion for a preliminary injunction. Having heard oral argument, and having thoroughly reviewed the record, the Court now sets forth its findings and renders its ruling with respect to Defendants' motion for injunctive relief.

## II.     Analysis

A preliminary injunction "is 'an extraordinary remedy' and 'should be granted only in limited circumstances.'" *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004)

(quoting *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994)).  Four factors must be satisfied for a preliminary injunction to issue: the movant must show (1) "a reasonable probability of success on the merits"; (2) that "the movant will be irreparably injured by denial of the relief"; (3) that "granting preliminary relief will result in even greater harm to the nonmoving party"; and (4) that "granting the preliminary relief will be in the public interest."  *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir. 1999).  "All four factors should favor preliminary relief before the injunction will issue."  *S & R Corp. v. Jiffy Lube Int'l., Inc.*, 968 F.2d 371, 374 (3d Cir. 1992).  It has often been stated that a court considering a motion for a preliminary injunction must adhere faithfully to the aphorism that "to doubt is to deny."  *Bateman v. Ford Motor Co.*, 310 F.2d 805, 808 (3d Cir. 1962) (quoting *Madison Square Garden Corp. v. Braddock*, 90 F.2d 924, 927 (3rd Cir. 1937)).

### A.    Defendants' Reasonable Probability of Success on the Merits

An applicant for a preliminary injunction "need only prove a prima facie case, not a certainty that he or she will win."  *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 173 (3d Cir. 2001).  It is neither necessary nor appropriate for a court, at the preliminary injunction stage, to resolve factual disputes.  *See Bonser v. State of New Jersey*, 605 F. Supp. 1227, 1232 (D.N.J. 1985).  "The purpose of a preliminary injunction is to preserve the status quo, not to decide the issues on their merits."  *Anderson v. Davila*, 125 F.3d 148, 156 (3d Cir. 1997).

Although numerous factual disputes cloud this Court's determination of Defendants' probability of success on the merits, the Court has little trouble concluding that Defendants' have proven their prima facie case.  Much of this dispute centers on whether Stuart Goldsmith retired in 2000.  As noted, Article XIII of the Certificate of Limited Partnership provides that in the

event of Stuart Goldsmith's "retirement," the limited partners shall have the right to designate a new general partner. Plaintiffs contend that Stuart Goldsmith announced his retirement to the tenants of Riverside in a 2000 letter, which stated that "effective June 1, 2000 Stuart Goldsmith will be retiring from the daily operations and management of the property." (Decl. of Allan L. Harris Ex. 13.) However, Defendants argue that the plain wording of the letter did not signal Stuart Goldsmith's retirement as general partner, but merely his retirement from the day-to-day management of Riverside. Moreover, they note, Paragraph 12 of the Certificate of Limited Partnership expressly vests the general partner with authority to appoint a managing agent, and expressly contemplates that such managing agent may be a member of the general partner's family.[4] The Court finds Defendants' arguments sufficient to make out a prima facie showing that Stuart Goldsmith in fact did not "retire."

If Plaintiffs ultimately fail to prove that Stuart Goldsmith has retired as general partner of the Partnership, then there will be a real question as to whether the actions taken by the limited partners constitute a breach of their fiduciary duties and the terms of the Settlement Agreement. For example, Paragraph 3 of the Settlement Agreement plainly provides that after Stuart Goldsmith reduced his ownership of the Partnership to 46%, the limited partners would take no

---

[4] Paragraph 12 provides, in relevant part, that
[t]he Limited Partners hereby consent to the employment, when and if required, of such brokers, managing and other agents, accountants and attorneys as the General Partner may from time to time reasonably determine. The fact that a partner, General or Limited, or a member of his family, is employed by, or directly or indirectly, interested in or connected with, any person, firm or corporation employed by the Partnership to render or perform a service, or from which the Partnership may purchase any property, shall not prohibit the General Partner from employing such person, firm or corporation, or from otherwise dealing with him or it . . . .
(Certificate of Limited Partnership ¶ 12, at 8.)

further action to divest him of his remaining ownership share.  Arguably, by purporting to elect RMM as general manager on January 5, 2006, Plaintiffs violated this provision of the Settlement Agreement.  Further violations may have occurred when RMM attempted to terminate Gator and Brite Star Building Management, or when RMM attempted to supplant Stuart Goldsmith's relationships with vendors who service Riverside.

Likewise, the Settlement Agreement provides that on December 31, 1988, December 31, 1989, and December 31, 1990, Stuart Goldsmith shall relinquish 18% per year of his ownership interest in the Partnership, such that "on December 31, 1990," his Partnership interest shall be reduced to 46% of its January 1, 1988 value.  (Settlement Agreement ¶ 1(a).)  The Settlement Agreement further provides that "at the time" Stuart Goldsmith's ownership interest decreased to 46%, he "shall" become secondary general partner and the former secondary general partner shall become primary general partner.  (*Id.* ¶¶ 1(b), 2(a).)  Finally, it provides that the limited partners "shall" name a secondary general partner "prior to the initial relinquishment by [Stuart Goldsmith]."  (*Id.* ¶ 2(a).)  There appears to be no dispute that Plaintiffs did not appoint a secondary general partner until on or about November 1, 2005.  (2/6/06 Tr. 25:12-14.)  Although the Settlement Agreement contains a general nonwaiver provision (Settlement Agreement ¶ 13), there may be a colorable argument under the plain language of the Settlement Agreement that the limited partners should have named a secondary general partner before December 31, 1990.  There also may be a question of whether Plaintiffs' delay, from the time of Stuart Goldsmith's purported retirement in June 2000 until the November 1, 2005 election of a secondary general partner, should cause this Court to apply the doctrine of laches to bar their claim.  (*See generally* Reply Br. Stuart O. Goldsmith Supp. Application Prelim. Inj. 14-17.)  Without deciding any of

these issues, the Court finds at this time that Defendants have demonstrated a reasonable probability of success on the merits.

Plaintiffs allege several instances where Defendants may have misappropriated Partnership assets. With respect to these alleged irregularities in the Partnership's books, Defendants allege that Plaintiffs are mistaken, or that at most, the irregularities amount to mere accounting inaccuracies. In any event, Defendants argue that three erroneous expenditures over the course of the last 25 years do not amount to evidence of systematic misappropriation. James Goldsmith has certified that the Partnership has annual expenses of over $600,000 for which it issues hundreds of checks per year, yet Plaintiffs have uncovered only three alleged instances of misappropriation. Thus, the Court finds that the proofs regarding this issue are in equipoise at this time. In the context of the Partnership's annual expenditures, the Court finds that the alleged accounting irregularities are not inconsistent with Stuart Goldsmith's protestations of innocent mistake. Once again, the Court need not decide the issue to conclude that Defendants have adequately demonstrated a reasonable likelihood of success on the merits.

### B.      Irreparable Injury to Movants in Not Granting Preliminary Injunction

The Court must also consider whether Stuart Goldsmith will be irreparably injured if injunctive relief is denied. There is evidence in the record that an ouster of Stuart Goldsmith likely would have consequences for Riverside's mortgage. Stuart Goldsmith's ouster could trigger an acceleration clause in Riverside's mortgage, making the Partnership's $2.2 million debt immediately payable.[5] Acceleration of the mortgage would also trigger a penalty clause

---

[5] Riverside's mortgage provides, in relevant part, the following:
The Debt will, at the option of the Mortgagee, become immediately due and payable in the event that the Mortgagor [i.e., Riverside] shall, without the prior written

requiring the immediate payment of an additional $400,000 penalty.  Other courts have found in similar contexts that such damages may constitute irreparable injury.  *See, e.g.*, *Baldridge v. Birkes*, No. 3:99-CV-2687-L, 2001 WL 1296995, at *7-8 (N.D. Tex. Oct. 9, 2001).  Defendants also contend that a change of the general partner would terminate insurance coverage under Riverside's current insurance policy, thus potentially exposing Stuart Goldsmith to personal liability for any mortgage acceleration or tort claims.  (*See* Certification of Stuart O. Goldsmith in Connection with Order to Show Cause Seeking Temporary Restraints ¶¶ 15-16, Ex. K.)

Plaintiffs respond that acceleration of the mortgage and penalties are "speculative," and that speculative damages do not support a claim of irreparable injury.  However, far less speculative is Defendants' claim that a power struggle between Stuart Goldsmith and Plaintiffs would cause confusion among the vendors attempting to service Riverside.  Judge Cavanaugh imposed temporary restraints in part based on Defendants' assertions that after RMM's purported election as general manager, vendors were in fact confused as to with whom to deal.  (*See generally* Certification of Thomas Sousa.)  More recently, Defendants' counsel has argued to this Court that the Partnership cannot operate with "two general partners at the head of the business directing different vendors to do the same type of work."  (5/23/06 Tr. 8:9-11.)  Plaintiffs have never adequately refuted these contentions.  Given that Plaintiffs' past efforts were aimed at unseating Stuart Goldsmith and asserting control over the Partnership, and that control of the

---

consent of the Mortgagee, . . . (b) sell, transfer or convey the Mortgaged Property or any part thereof or any interest therein, which shall include but not be limited to . . . (ii) where the Mortgagor is a partnership, the transfer of any of the interest in the Mortgagor, or the withdrawal, resignation or retirement of the general partner . . . .
(Certification of Stuart O. Goldsmith in Connection with Order to Show Cause Seeking Temporary Restraints Ex. J ¶ 9.)

Partnership is precisely what is at stake in this litigation, the Court finds sufficient evidence that Plaintiffs will cause irreparable injury to Stuart Goldsmith if a preliminary injunction does not issue.

### C. Irreparable Harm to Non-Movants in Granting Preliminary Injunction

Plaintiffs are likely to suffer far less harm if an injunction should issue than will Stuart Goldsmith if an injunction does not issue. Stuart Goldsmith has been general partner since 1981. While there is evidence that in recent years the medical arts building has fallen into some disrepair, and while there is also some evidence of misappropriation of Partnership funds, this evidence, in the Court's measured view, does not suggest the need for Stuart Goldsmith's immediate ouster. Nor does the Court believe that this evidence demonstrates the requisite gross or fraudulent mismanagement necessary to justify the appointment of a fiscal agent. *See Roach v. Margulies*, 42 N.J. Super. 243, 245, 126 A.2d 45, 46 (App. Div. 1956). Where the Partnership has functioned under Stuart Goldsmith's management for the past 25 years, and where events of the past six years do not militate in favor of allowing Plaintiffs to take immediate measures to ensure the preservation of the *res*, the Court concludes that Plaintiffs will suffer no irreparable injury if the status quo is maintained for the duration of this litigation.

### D. Public Interest

Finally, the Court must consider how a grant or denial of preliminary injunctive relief will affect the public interest. *Oburn v. Shapp*, 521 F.2d 142, 152 (3d Cir. 1975). The Court finds that this final factor weighs in favor of the issuance of a preliminary injunction. Courts generally disfavor the remedy of self-help when appropriate judicial or administrative avenues are available. *See Assassination Archives & Research Ctr. v. C.I.A.*, 48 F. Supp. 2d 1, 15 (D.D.C.

1999). There is no question that in January of this year, while this litigation was pending, Plaintiffs took extrajudicial measures to unseat Stuart Goldsmith and supplant vendors with whom Gator had contracted to serve Riverside. Were the Court to lift the temporary restraints currently in place, Plaintiffs would be free to resume their resort to the self-help remedy. As described above, this likely would have negative consequences for vendors doing business with the Partnership, as well as the Partnership itself. Where the Partnership exists to provide facilities for the provision of medical services, a sufficiently heated extrajudicial dispute between the parties presents the possibility of a disruption of those services. For these reasons, the public interest favors certainty in the management of the Partnership and disfavors Plaintiffs' self-help remedies. This interest, in turn, favors maintenance of the status quo while this dispute is resolved judicially.

**III.   Conclusion**

For all of the foregoing reasons, the Court finds that Defendants are entitled to a preliminary injunction. Accordingly, Plaintiffs' motion for a preliminary injunction is GRANTED. The Court will increase the required bail to $15,000. A separate Order shall follow.

Newark, New Jersey
Dated: June 5, 2006

                                                  s/ Harold A. Ackerman
                                                  U.S.D.J.